**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Crim. No. 13-29 (KM) |
| **v.** | : | |
| **HO-MAN LEE,** | : | **MEMORANDUM OPINION** |
| **Defendant**. | : | |

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the Court upon the motion (Dkt. No. 150) of the defendant, Ho-Man Lee, to withdraw his plea of guilty, pursuant to Federal Rule of Criminal Procedure 11(d).[1] For the reasons expressed below, the motion is denied.

Defendant Lee seeks to withdraw his plea of guilty to a charge of conspiracy to obtain fraudulent driver's licenses for undocumented immigrants. At trial, Lee would attempt to prove that Han Chul Na (who has since been convicted of a similar offense) falsely held himself out as a government agent and that he, Lee, sincerely believed he was assisting Na in an investigation of criminal activity. The evidence in support of such a "government agent" intent defense,[2] however, was in Lee's hands before he pled

---

[1]     The motion was pending when the case was recently reassigned to me from District Judge Hochberg, who is now retired from the bench. (Dkt. No. 167)

[2]     As used herein, "government agent defense" refers to defendant's sincere, if incorrect, belief that he was acting at the direction of a government agent. Such a

guilty. What has changed, says Lee, is that Mr. Na is now more available as a witness. Na, however, was known and available to Lee before he entered his guilty plea; in fact, Na voluntarily spoke to Lee's private investigator. Na's general credibility is open to question. And Na revealed for the first time at the hearing that he and Lee used the fruits of their "investigation" to set up a fraudulent document operation of their own. Na's presence at trial might have actually detracted from the evidence already in Lee's possession before the plea. But at any rate, Lee's tactical reassessment is not a sufficient basis for withdrawal of his admission of guilt under oath.

As the date of trial approached, Lee filed a notice that he would assert a "public authority" defense, *i.e.,* that he was *in fact* acting on behalf of the government when he committed the criminal acts. Both Lee and the government investigated the underlying facts, but found no evidence that Na was a government agent. Lee then withdrew his claim of public authority, and pled guilty. He now says, however, that he *believed* he was acting at the direction of a government agent when he participated in the conspiracy. Lee contends that this belief, although false, negates his criminal intent.

After reviewing the parties' submissions, I heard oral argument and held an evidentiary hearing on April 14, April 16, and April 20, 2015. At the hearing, I heard testimony from Defendant Ho Man Lee, Han Chul Na ("Na"), and Homeland Security Investigations Foreign National Investigator Chong Cho. A number of documentary exhibits were received in evidence.

Ultimately, I did not find the "government agent" intent defense convincing. That, standing alone, does not dispose of the issue before me; a jury could see the matter differently. I do consider the defense's implausibility, however, in the context of evaluating the strength and sincerity of Lee's stated reasons for wishing to withdraw his plea. *See Gov't of the Virgin Islands v.*

---

belief is said to negate the criminal intent that the government is required to prove as an element of the offense. It is to be distinguished from the more formal "public authority" defense, *i.e., a* defendant's contention that he acted with actual governmental authorization.

*Berry*, 631 F.2d 214, 220 (3d Cir. 1980) (The Court may assess "'[t]he good faith, credibility and weight of a defendant's assertions . . . in support of a motion under [current Rule 11(d)]'") (quoting *United States v. Washington*, 341 F.2d 277, 281 (3d Cir. 1965)).

My decision turns primarily on the fact that Lee's intent defense is based on matters well known to Lee at the time he entered his plea of guilty. He possessed much of the email evidence upon which he now relies, and his investigator had interviewed Na. Under such circumstances, Lee's plea must be considered an informed waiver of the "government agent" intent defense and a tactical decision to avoid the risk of placing it before a jury. Lee's tactical assessment may have changed, but the basic facts have not.[3]

These facts do not rise to the level of justifying Lee's withdrawal of his plea of guilty.

## I. ANALYSIS OF THE EVIDENCE

### a. General Observations on Credibility

I have observed the demeanor of the witnesses and considered the plausibility of their accounts. Before summarizing and analyzing the evidence, I make the following general observations about their credibility.

As defendant, Ho Man Lee obviously possesses a vital interest in the outcome of this proceeding. That does not disqualify him. It does require that a fact finder weigh his testimony with care.

Mr. Lee moved to this country in 1999. He gained some eight years' experience as an intelligence analyst in the South Korean military, retiring with the rank of First Sergeant. He has college-level degrees in business and physical education. He is an accomplished practitioner of Tae Kwon Do and has run a business. He is married, and has a steady employment history. He

---

[3]    I say "Lee's" tactical assessment advisedly. He has not placed in issue the legal advice given him by his attorney, Mr. Horn, in connection with the plea. Mr. Brickfield, the attorney who has taken the lead on this motion, objected to questions that might have elicited communications between Lee and Horn, and I sustained those objections.

possesses legal immigration status. He has no prior criminal history, and has not employed aliases.

Lee's background does not raise any general credibility concerns, but it does raise questions about his self-portrayal as Na's gullible victim. Although not a native of this country, Lee is not unsophisticated or naive. If Na in fact claimed to be a "part-time" ICE agent, with license to authorize extensive criminal behavior, that claim could not have been a very plausible one. Nor did Na conduct this alleged "investigation" in any regularized manner. It is difficult to reconcile Lee's credulity with his general sophistication or his military experience.

My assessment of Mr. Lee's demeanor was hampered somewhat, because he (like Na) testified through an interpreter. In general, Mr. Lee's answers to questions were responsive. At times, it was difficult for the government cross-examiner to obtain a forthright answer. A yes-or-no question—for example, whether a certain fact appeared in a document—tended to elicit a self-justifying narrative. Lee testified that certain emails existed, but resisted the government's efforts to obtain stored emails that might have corroborated his account. He failed to supply crucial names, dates, and places; thus critical details, such as his claim to have given away the criminal proceeds to fund a college scholarship, remain unverifiable.

As to Mr. Na, I have acute credibility concerns. Na has repeatedly proved to be untruthful and manipulative, particularly in his dealings with the government. For example, to acquire his student visa in 2002, Na falsely represented he was a university student. He attempted to extend his stay in the United States by falsely claiming to be a Korean traditional music performing artist. (*See* United States' Opp'n Ex. 36). And even after he was arrested, Na attempted to halt his deportation proceedings by filing documents stating that he was a medical doctor. (Def.'s Mot. Ex. 39). Na admitted on cross-examination that these actions were fraudulent.

Na had an evident interest in helping his friend defeat the charges. Indeed his whole range of conduct, both before and after arrest, is consistent

with a desire to shield Lee. Once Na had pled guilty, and especially as he awaited deportation,[4] Na had little to lose from exculpating Lee.

Lee seeks to withdraw his guilty plea, essentially on the basis of Na's increased availability as a witness. Na's lack of credibility makes him an unlikely savior. I am of course cognizant that, from Lee's point of view, Na's unreliability is precisely the point: Lee claims to have been a victim of Na's duplicity. The fact remains that a jury would find it difficult to believe Na's uncorroborated statements, as did I.

### b. Lee's Dealings with Na and Park

Defendant Ho-Man Lee Lee emigrated to the United States in the late 1990s. In the spring of 2007 Lee met Han Chul Na, another Korean-born immigrant, at a Tae Kwon Do supply store. Lee testified that in 2007, Na said that he was a "part-time" agent of Immigration & Customs Enforcement ("ICE"). According to Lee, Na displayed a badge, handcuffs, ICE letters, and a business card stating that Na was "Director" of Homeland Security.

Lee testified that Na "pressed [Lee to] provide information" about illegal activities in the Korean community. Na allegedly said he "needed to obtain information about big cases two to three times a year" in order to be promoted to a full-time agent. Na, too, testified that he had represented himself as an agent of Homeland Security and asked Lee to provide information. His motivation, he said, was to curry favor with law enforcement and perhaps obtain lawful immigration status for himself or others.

Lee testified that he began providing Na with information about fraudulent activities in the Korean community. He introduced in evidence several emails to Na that described loan scams and immigrant smuggling operations. (Def.'s Mot. to Withdraw Plea of Guilty [hereinafter "Def.'s Mot."] Exs. 1, 3, 51)

---

[4]     Mr. Na, having served his sentence, is awaiting deportation. He is currently being held pursuant to a material witness warrant issued by Judge Hochberg. (Dkt. Nos. 154, 155) Na is represented by Cynthia H. Hardaway, Esq., who appeared at the hearing when Na testified.

Lee testified that in 2011 Na instructed him to gather information on a person named Oscar Park. Na described Park as the "biggest broker" for fraudulent immigration documents. Lee was to "call [Park] and find out what he was doing . . . [regarding] illegal immigration" and then participate in the scheme. Lee contacted Park and became a broker in Park's fraudulent document operation. Left unexplained was Park's apparently immediate willingness to trust Lee and reveal the workings of his criminal operation.

In September 2011, Lee started meeting with Park's customers, i.e., undocumented aliens seeking to obtain fraudulent driver's licenses. For each customer, Lee took pictures, gathered documentation, and sent the documentation to Park via Federal Express. Park would then send Lee the forged I-797 immigration form that would enable the customer to obtain a driver's license. Lee then guided the customer through the process of obtaining a license from the Virginia Department of Motor Vehicles, and collected between $2,500 and $4,000 in cash. Lee would deposit the money in accounts designated by Park, keeping $500 for himself. Lee was to destroy the I-797 forms after the license had been obtained but, as stated below, he retained many of the forms.

Lee testified that he forwarded paperwork to "Agent Na" as evidence. The record contains some emails attaching such material. (*See* Def.'s Mot. Ex. 4 (September 2011 email with fraudulent Form I-797), Ex. 5 (October 2011 email from Park requesting money order and passport); Ex. 8 (November 2011 email with forged immigration document); Ex. 10 (January 2012 email with forged bank statement); Ex. 11 (January 2012 email with forged extension of validity)). According to Na, however, Lee never gave him copies of the Fed Exes to and from Park, or the bank records of deposits.

Na did not forward most of these documents to Homeland Security. Na did, however, feed Homeland Security limited information and told them that Lee was "pretending" to work for Park. (*See* United States' Opp'n Ex. 7 (January 2012 email from Na to Investigator Cho stating: "Ho Man LEE, told [Na] that he knew the broker [Oscar Park] and asked [Na] if he is pretending to

work for the broker . . . Oscar PARK . . . ."); Ex. 9 (email from Na to Agent Leary stating: "I am trying to get a driver's license from [Choi] with the help of a person named Homan Lee that I know about so I can give as a kind of proof")).

Lee did all of this undercover work, he says, for no pay. His stated motivation was to help Na obtain a promotion to full-time employment with Homeland Security.

Lee's claim to have worked for no financial benefit is not entirely coherent. He does not mean that he did not receive money; he means that he gave it away. Lee admittedly received the $500 commissions in cash and kept the cash in a drawer. He kept no financial records. He did not explain why, if he was legitimately working for law enforcement, it was necessary to keep the proceeds in cash form. Lee allegedly met with Na in person approximately every two weeks, and allegedly turned over "evidence." But Lee never turned over the money, which surely also would have been "evidence." At some point, Lee says, he used the accumulated money to fund a college scholarship for an unnamed person at his Tae Kwon Do facility.

Lee stopped working for Park in early 2012. Lee testified that he quit because it was taking time away from his martial arts business. But damaging testimony by Na suggests an alternative reason: Having learned the tricks of the trade and accumulated the necessary documents from Park, Na and Lee were ready to strike out on their own.

Na testified that, in early 2012, he asked Lee not to destroy Park's I-797s, but to retain them. Critically, Na admitted on cross-examination that he told Lee that he was going to use the forms to set up his own fraudulent driver's license operation, similar to that of Oscar Park. Na testified that he, Lee, and a third person did in fact set up their own fraudulent scheme. They reused the I-797 forms that Lee had obtained from Park, scrubbing them after each use, to obtain fraudulent driver's licenses for customers. (*See* United States' Opp'n Exs. 62, 63 (chart by Na illustrating relationships in the scheme)).

Recall that Na's potential testimony was the foundation of Lee's bid to withdraw his guilty plea and win an acquittal at trial. Na, however, admitted that he had Lee gather information and documents from Park to start his own fraudulent driver's license operation, in which Lee was a knowing participant. That admission severely undercut Lee's contention that Na's availability as a witness would enhance his "innocent intent" defense.

Lee testified that Na, in addition to holding himself out as a part-time agent of Homeland Security, worked as a real estate broker, operated a headhunting business, ran companies called Harvard Education Consulting and Prime Education Consulting, and operated a business assisting high-value investors obtain E-2 visas. Na and Lee cooperated in various business ventures, including brokering a commercial sale of a restaurant in April 2012, negotiating a lease related to a medical center, negotiating several real estate deals in early 2012, and helping the son of Lee's cousin transfer to a United States college through Na's educational consulting business in November 2011. (United States Opp'n to Def.'s Mot. to Withdraw Guilty Plea [hereinafter "United States' Opp'n"] Exs. 53 at 9, 193, 285, 303, 320). Lee's close and multifaceted business relationship with Na also tends to undercut any claim that he was Na's unwitting dupe.

### b. Facts Known to Lee Before His Guilty Plea

The record demonstrates that Lee, before he entered his guilty plea, knew the essential facts underlying the "government agent" intent defense, possessed most of the physical evidence, and had, through a private investigator, interviewed Na on the subject.

Lee was arrested on June 27, 2012. He was indicted by a grand jury and a superseding indictment was returned on November 26, 2013. The Indictment charges Lee and others, led by Oscar Park (a/k/a Young-Kyu Park),[5] with

---

[5] In 2013, Park was convicted of, among other things, conspiracy to produce false identification documents.

production of fraudulent driver's licenses and conspiracy to produce fraudulent driver's licenses. The conspiracy count of the indictment states:

> From in or around mid-2010 through in or around June 2012, in Bergen County, in the District of New Jersey and elsewhere, defendants HO-MAN LEE [and others] knowingly and intentionally conspired and agreed with each other, Co-Conspirators Young-Kyu Park and Ki-Sok Kim, and Co-Conspirator One and Co-Conspirator Two, and others, to produce, without lawful authority, identification documents, namely, genuine but fraudulently issued driver's licenses and false identification documents, namely, counterfeit and altered Korean passports, in and affecting interstate commerce, contrary to Title 18, United States Code, Sections 1028(a)(1), 1028(b)(1), and 1028(c)(3)(A).

Object of the Conspiracy

> 3. The object of the conspiracy was for the Park Criminal Enterprise to profit by fraudulently obtaining driver's licenses for illegal aliens and other ineligible applicants.

(Docket No. 104, Count 1 ¶¶ 1-3).

The indictment alleges that Park and his associates, including Lee, procured stolen blank immigration forms, called Forms I-797. An I-797 form, or Notice of Action, is used to communicate an immigration benefit between agencies. Conspirators allegedly filled in the stolen blank forms with illegal aliens' personal information, generated other fraudulent documents including false bank statements, and accompanied customers to state departments of motor vehicles. (*Id.* Count 1 ¶¶ 5-14). Once there, a member of the conspiracy allegedly guided each customer through the process of obtaining a fraudulent, but genuine, driver's license.

Turning to Lee in particular, the superseding indictment alleges that he "obtained documents, such as foreign passports, and down payments" from illegal aliens seeking fraudulent driver's licenses in Virginia. (*Id.* Count 1 ¶ 11). In return for cash payments, Lee allegedly gave these customers false documents, including immigration forms and bank statements, and assisted

9

them in applying for driver's licenses using those fraudulent documents. (*Id.* Count 2 ¶ 2).

The Court set a trial date for January 16, 2014, and entertained pretrial motions. On November 21, 2013, Lee provided notice to the Government pursuant to Federal Rule of Criminal Procedure 12.3, stating his intent to present a "public authority" defense. (United States' Opp'n Ex. 2).

Counsel for both sides then began investigating whether Na had worked as an agent of Homeland Security and had authorized Defendant's conduct. Defendant hired a private investigator, who conducted two interviews with Na. (*See* United States' Opp'n Exs. 15 & 16). During these interviews, Na said that he was in the country illegally and that he had been in contact with Chong Cho, a representative of Homeland Security Investigations based in South Korea. (*See* United States' Opp'n Ex. 15). Na stated that he gave Cho "information pertaining to . . . illegal activity involving Korean immigrants coming into the United States." (*Id.*).

One of the ways Na obtained such information, he said, was by approaching Lee in 2008. At that time, he allegedly "advised Mr. Lee that [Na] worked for Homeland Security Korean Division" and "showed Mr. Lee a Homeland Security business card of Mr. Chong Cho." (*Id.*). Na admitted that he was giving Cho information in the hope of assistance in "obtain[ing] Green Cards for Mr. NA's brother in law and his family." (*Id.*) Na stated that "he stopped providing information . . . in 2012, because Mr. Cho reneged on his promise to obtain Green Cards." (*Id.*). [6]

---

[6] In testimony that I credited as fact finder, Investigator Cho testified by telephone from South Korea. He stated that Na never forwarded any documents regarding Park to Homeland Security, never forwarded any emails from the Defendant, frequently failed to respond, and did not provide substantive information. Cho testified that he made no promises to Na regarding immigration status, never told Na to instruct sources to participate in illegal activity, and never authorized Defendant's participation in Park's scheme. True, there was no evidence that Lee was privy to Na's communications with Cho. But Cho's lack of interest only makes it less plausible that Na set up an elaborate "government agent" charade with his friend Lee.

In his interview, Na stated that he "requested that Mr. Lee try and gather information on an individual identified as Young-KYU Park (aka Oscar Park). . . Mr. Lee provided requested information to him from 2008 thru 2012. . . Na indicated that he would then forward this mentioned information to Mr. Chong Cho in Korea." (United States' Opp'n Ex. 15). Additionally, in 2011, Na told Special Agent Leary, a Homeland Security agent operating out of Virginia, that that any information regarding the Park conspiracy was "mainly provided by Ho-Man Lee." (United States' Opp'n Ex. 16).

The claim that Na had acted as a government agent collapsed; he was at best an informant, and an unsuccessful one at that. On December 24, 2013, Lee "withdr[ew] his previously provided notice of a public authority defense." (Dkt. No. 109).

On December 26, 2014, the Government provided Lee with the fruits of its own investigation. (United States' Opp'n Ex. 6). Among those were emails from Investigator Cho. These translated emails confirm that Na had reported to Cho his recruitment of Lee: "Ho Man LEE, told [Na] that he knew the broker [Oscar Park] and asked [Na] if he is pretending to work for the broker . . . Oscar PARK . . . ."; "Recently PARK told LEE that he can get a driver license for the people and asked Lee to consult with his clients and to accompany them to the DMV."; and Na "may ask [the Defendant] to get fraudulent documents from Oscar [Park] for evidence." (United States' Opp'n Ex. 7). The Government also provided Lee's counsel with an email Na sent to Homeland Security Investigations Special Agent Leary stating: "I am trying to get a driver's license from [Choi] with the help of a person named Homan Lee that I know about so I can give as a kind of proof. . . ." (United States' Opp'n Ex. 9).

About ten days later Lee reached a plea agreement with the Government. He agreed to plead guilty to conspiracy to commit fraud in connection with identification documents, in violation of 18 U.S.C. § 1028(f).

At the motion hearing, Lee admitted that at the time he agreed to plead guilty, he knew about his private investigator's interview with Na. He possessed documents, both his own and the ones produced by the government on

December 26, 2013. His counsel, in summation, stressed that the time between receiving the documents and entering the plea was only about ten days. I find that this was enough time to review and absorb the material

### c. Lee's Guilty Plea

On January 7, 2014, Magistrate Judge James B. Clark, III, conducted a plea colloquy with the Defendant. During the Rule 11 hearing, the Court ensured that the Defendant read, understood, and had discussed the plea agreement with his counsel. After Defendant Lee was placed under oath, Judge Clark asked a series of questions, and the Defendant gave the following answers:

> THE COURT: Have you fully discussed these charges and the case in general with your attorney?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And are you -- are you fully satisfied with the representation and advice given to you in this case by your attorney?
>
> THE DEFENDANT: Yes.
>
>    ***
>
> THE COURT: And is your willingness to plead guilty today because you are in fact guilty to the charges which you'll be pleading?
>
> THE DEFENDANT: Yes.

(Rule 11 Tr. 6:12-7:1)

The Court also ensured that Lee understood the trial-related rights that he was waiving:

> THE COURT: Alright. Mr. Lee, do you understand that you have a right to plead not guilty to any offense charged against you?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you understand that you have the right to persist in that plea of not guilty to a trial by jury, and during the trial you would also have the right to the assistance of counsel for your defense?
>
> THE DEFENDANT: Yes.

THE COURT: You understand that you would have the right to see and hear all of the witnesses, and have them cross examined in your defense?

THE DEFENDANT: Yes.

\*\*\*

THE COURT: You understand that you would have the right to issue subpoenas or compulsory process for witnesses to testify in your defense?

THE DEFENDANT: Yes.

(Rule 11 Tr. 7:2-21).

Finally, Lee was asked about the specific facts underlying the charged conduct:

[THE COURT]: Mr. Lee, the essential elements of the Title United States Code Section 1028(f), . . . to secure a guilty verdict are: One, that the conspiracy or agreement was formed, reached, or entered into by two or more persons; and two, at some time during the existence or life of the conspiracy agreement, or understanding, the defendant knew the purpose or purposes of the agreement. And with that knowledge, deliberately joined the conspiracy agreement.

THE DEFENDANT: Yes.

THE COURT: Mr. Lee, we've just reviewed the charges against you, the statute under which those charges are brought, the essential elements that the Government would need to prove. Do you understand all of that?

THE DEFENDANT: Yes.

(Rule 11 Tr. 23:18-24:6)

The Assistant U.S. Attorney, as is customary in this Court, elicited from Mr. Lee the factual basis for the guilty plea:

[THE GOVERNMENT]: Sir, beginning in or about the summer of 2011, in Bergen County, New Jersey, and elsewhere, did you conspire and agree with Youn-Kyu Park, also known as Oscar, and others, to use, without lawful authority, fraudulent issued driver's licenses?

THE DEFENDANT: Are you asking me what I did? Yes.

[THE GOVERNMENT]: And did you and your co-conspirators fraudulently obtain[] driver's licenses for illegal aliens who are unlawfully able to obtain such driver's license?

THE DEFENDANT: Yes.

[THE GOVERNMENT]: For a fee of several thousand dollars, did you and your co-conspirators provide the customers with a variety of false and fraudulent documents needed to cause driver's licenses to be issued?

THE DEFENDANT: Yes.

[THE GOVERNMENT]: In furtherance of this conspiracy, did you support these customers to various state agencies in Virginia that issued driver's licenses, so they could use fraudulent documents to obtain driver's licenses?

THE DEFENDANT: Are you just talking about Virginia, only Virginia?

[THE GOVERNMENT]: Yes.

THE DEFENDANT: Yes, only Virginia.

[THE GOVERNMENT]: And did you knowingly and intentionally join a conspiracy alleged in Count One of the superseding indictment with knowledge of the purpose, and with the intent to further that purpose?

THE DEFENDANT: Yes.

(Rule 11 Tr. 24:13-25:15).

Throughout the colloquy, Mr. Lee was responsive to Judge Clark's questions and gave appropriate answers. Judge Clark found that "the defendant fully understood the nature of the charges, and the consequences of the guilty plea . . . [and] that the defendant was fully competent and capable of entering an informed guilty plea." (Rule 11 Tr. 27:4-21). The District Court adopted Judge Clark's findings and accepted the plea on January 23, 2014.

This plea came on the eve of the scheduled trial date. Less than two weeks after Defendant pleaded guilty, the Court proceeded with the trial of the remaining co-defendant, Martin Trejo. Over four days of testimony, the Government called seven witnesses, including a cooperating witness. The jury found Trejo guilty on January 23, 2013.

14

#### d. Facts Learned by Lee after his Guilty Plea

On January 23, 2013, federal agents arrested Mr. Na in Virginia and charged him with conspiracy and passport fraud. Na signed a plea agreement and admitted to selling fraudulent driver's licenses to illegal aliens in a separate driver's license scheme in Virginia. (*See* United States' Opp'n Ex. 21).

Na also discussed his relationship with Lee. During a proffer session with the Government on March 18, 2014, Na told investigators that he produced a business card stating that he was an employee of Homeland Security and used it to recruit other individuals to provide him with information. (*Id.*; *see also* United States' Opp'n Ex. 24 (business card representing Na as "Director" of "Department of Homeland Security - ICE")). Two days later, Na wrote a letter to Judge Hochberg of this Court regarding Lee. In the letter, Na stated that he "hid [his] illegal visa status" from Lee and "lied to [Lee] saying 'I am an agent of Homeland Security' . . . I asked . . . Ho Man Lee to provide me with [information] about illegal brokers and illegal work and told him this would enable me to get a full time job with Homeland Security." (United States' Opp'n Ex. 23). Na claimed that he "informed Mr. Cho" that he "suggested to Ho Man Lee to work for [Oscar Park] to get more detail [sic] information." (*Id.*). A Senior Pastor of a Virginia mission also wrote to the Court, stating that he knows Na and "believed Han Chul Na [w]as a Homeland Security agent." (Def.'s Mot. Ex. 15).

Lee's sentencing was scheduled for April 2014, but was adjourned several times at the request of defense counsel. Weeks before the sentencing hearing scheduled for February 2015, over a year after Defendant pleaded guilty, he moved to withdraw his plea. (Dkt. No. 150).

## II. DISCUSSION

Federal Rule of Criminal Procedure 11 provides that "[a] defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if: . . . the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d). "[T]he defendant is not

entitled to withdraw that plea simply at his whim," *United States v. Jones*, 336 F.3d 245, 252 (3d Cir. 2003), and "has no absolute right to withdraw a guilty plea prior to sentencing." *United States v. Crowley*, 529 F.2d 1066, 1071 (3d Cir. 1976) (quoting *United States v. Vallejo*, 476 F.2d 667, 669 (3d Cir. 1973)). However, "withdrawal of a guilty plea before sentence is liberally allowed wherever for any reason the granting of that privilege seems fair and just." *United States v. De Cavalcante*, 449 F.2d 139, 141 (3d Cir. 1971). Nevertheless, the defendant "bears a 'substantial burden' of 'showing a fair and just reason for the withdrawal of his plea.'" *United States v. Siddons*, 660 F.3d 699, 703 (3d Cir. 2011) (quoting *United States v. King*, 604 F.3d 125, 139 (3d Cir. 2010)).

"A district court must consider three factors when evaluating a motion to withdraw a guilty plea: (1) whether the defendant asserts his innocence; (2) the strength of the defendant's reasons for withdrawing the plea; and (3) whether the government would be prejudiced by the withdrawal." *Jones*, 336 F.3d at 252. I discuss those three factors in turn.

### a. Whether the Defendant Asserts His Innocence

The first factor is whether the defendant asserts his innocence. The inquiry, however, does not stop at mere "assertion." The Court may assess "'[t]he good faith, credibility and weight of a defendant's assertions . . . in support of a motion under Rule 32(d)[7] . . . .'" *Gov't of the Virgin Islands v. Berry*, 631 F.2d 214, 220 (3d Cir. 1980) (quoting *United States v. Washington*, 341 F.2d 277, 281 (3d Cir. 1965)). "Assertions of innocence must be buttressed by facts in the record that support a claimed defense." *Wilson*, 429 F.3d at 458 (internal citation and quotation marks omitted). Further, a defendant must "give sufficient reasons to explain why contradictory positions were taken

---

[7] "The Federal Rules of Criminal Procedure were amended in 2002 to, inter alia, move the substance of prior Rule 32 authorizing defendants to seek the withdrawal of a guilty plea prior to sentencing to Fed. R. Crim. P. 11(d). Because the substance of the rule has not changed, precedent referring to Rule 32 continues to be authoritative." *United States v. Wilson*, 429 F.3d 455, 458 n.2 (3d Cir. 2005).

before the district court." *Siddons*, 660 F.3d at 703 (quoting *Jones*, 336 F.3d at 253).

### 1.    Lee's claim of innocence

Mr. Lee now asserts that, when committing the acts constituting the offense, he did not possess the required intent under 18 U.S.C. § 1028(f). The statute prohibits conspiracy to produce an identification document "knowingly and without lawful authority." 18 U.S.C. § 1028(f), (a)(1). Lee asserts that he did not knowingly act without lawful authority because he mistakenly but sincerely "believed that Master Na was working for the Government and therefore he had lawful authority to engage in these actions." (Def.'s Br. 7).

Cases have held that a defendant's specific criminal intent may be negated by his honest belief that, when he performed otherwise-criminal acts, he was acting on behalf of the government. *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994); *see also United States v. Pitt*, 193 F.3d 751, 758 (3d Cir. 1999) (noting that *Baptista-Rodriguez* analyzed several possible defenses based on perceived governmental authority). Assuming without deciding that a defendant's sincere belief that he is cooperating with law enforcement negates the mental state required for a conviction under 18 U.S.C. § 1028(f), I consider Lee's claim of innocence.

Lee's claim is as follows: Na, representing himself as a part-time ICE agent, asked Lee to give him information about criminal activities. In 2011, he asked Lee to go undercover and infiltrate the Park organization so that he could find out how Park managed to make the documents necessary to obtain a driver's license, what kind of documents Park requested from customers, and what information Park communicated to the Department of Motor Vehicles.

Lee admittedly performed acts that were criminal in nature. He collected personal information from customers, sent it to Park for incorporation into false documents, received the false documents, and used them to help undocumented aliens obtain driver's licenses. From the customers, he collected $2500-$4000 apiece. In each case Lee deposited most of the money to accounts controlled by Park, while keeping $500 as a commission.

I do not find Lee's account very credible. For example, the "undercover agent" scenario implies that Lee did not profit from the scheme. But Lee collected $2500-$4000 per license, deposited it into accounts designated by Park, in each case retaining $500 himself. Lee says that he kept the money in a drawer and then used it to create a college scholarship for an unnamed person at his martial arts studio. Of course, it would be no defense that the proceeds of the crime were spent in an admirable cause. At any rate, it makes little sense that Lee, if he was collecting evidence for "Agent Na," would not also have turned the cash over to Na. Finally, as Lee admitted on cross-examination, he had never before mentioned this informal scholarship program, despite many opportunities to do so. He did not report the cash to Probation in connection with preparation of the presentence report; he did not disclose it as a gift in his bankruptcy petition (although he reported another personal gift worth $1000); and he did not mention it in his certification in support of this motion.

In addition, Lee admittedly helped obtain fraudulent driver's licenses for his friends and family members, at reduced rates. (*See* United States' Opp'n Ex. 55, at 3 (December 2011 email showing "Master Lee's friend" received reduced price)). Once again, this is inconsistent with Lee's contention that he was simply setting up the participants in the scheme for criminal prosecution.

I found other aspects of this "government agent" scenario incredible, for reasons touched on above. Na's claim to be a jack of all trades (one of those many trades being part-time Director of Homeland Security) was not a plausible one. It is hard to believe that Lee simply took it at face value. Na and Lee worked closely together in a number of business ventures, which also detracts from the plausibility of the duping scenario.

Na's communications to Investigator Cho and Agent Leary, in which he spoke of "recruiting" Lee, who was "pretending" to work for Park, are not persuasive. Na was exculpating both Lee and himself, while angling for favorable treatment.

As discussed further below, Na admitted that he exploited the information about Park's fraud to set up his own fraudulent operation. In that

new fraud operation, he continued to use Lee's services. Crucially, Na testified that he told Lee he was doing this. That would make little sense if Na had been stringing Lee along. Na's statements were consistent with a desire to protect Lee to the extent possible, while currying favor with the government. Finally, for the reasons expressed above, I had general credibility concerns about both Na's and Lee's testimony.

For all of these reasons, I find Lee's assertion of innocent intent to be lacking in indicia of "good faith, credibility and weight." *Gov't of the Virgin Islands v. Berry*, 631 F.2d at 220.

### 2. Explanation for contrary position during Rule 11 hearing

Lee must also explain why, if he did not possess criminal intent, he stated under oath at his guilty plea hearing that he did.

In December 2013, Lee received a report of his own private investigator's interview of Na, as well as the results of the Government's investigation of his proffered "public authority" defense. Lee's counsel withdrew his notice of intent to offer a public authority defense. On January 7, 2013, Lee entered into an agreement to plead guilty. At the guilty plea hearing, Lee told the Court that his attorney had advised him on the "possible defenses that I might have in this case." (United States' Opp'n Ex. 20 ¶ 16). He answered affirmatively to the court's question whether he was "fully satisfied with the representation and advice given to you in this case by your attorney." (Rule 11 Tr. 6:15-18). Judge Clark explained the elements of the offense, and Lee stated that he understood that the Government had the burden to prove each one beyond a reasonable doubt.

Specifically, Lee admitted guilt with respect to the element of intent:

[THE GOVERNMENT]: In furtherance of this conspiracy, did you support these customers to various state agencies in Virginia that issued driver's licenses, so they could use fraudulent documents to obtain driver's licenses?

THE DEFENDANT: Are you just talking about Virginia, only Virginia?

[THE GOVERNMENT]: Yes.

THE DEFENDANT: Yes, only Virginia.

[THE GOVERNMENT]: And did you knowingly and intentionally join a conspiracy alleged in Count One of the superseding indictment with knowledge of the purpose, and with the intent to further that purpose?

THE DEFENDANT: Yes.

(Rule 11 Tr. 25:3-9).

Lee also signed a Rule 11 form, which contains a handwritten response regarding the nature of the charge to which he was pleading guilty: "[I] conspired with others to produce fraudulent drivers licenses for illegal immigrants without lawful authority." (United States' Opp'n Ex. 20 ¶ 7).

A plea of guilty is a statement under oath, not a stopgap option to be discarded when it is no longer useful. A defendant who wishes to withdraw a plea of guilty must "give sufficient reasons to explain why contradictory positions were taken before the district court." *United States v. Siddons*, 660 F.3d 699, 703 (3d Cir. 2011); *United States v. Jones*, 336 F.3d 245, 253 (3d Cir. 2003). Lee has failed to give any adequate explanation here.

Essentially, Lee stated that, at the time he pled guilty, he believed the Government would prevent Na from testifying. Lee also claimed that he had believed that certain emails could not be used in court. Generally, he stated, he pled guilty reluctantly and hesitantly.

Defendant's assertion that he believed the Government would block Na from testifying, or that he could not introduce emails in evidence, is belied by the record of the plea hearing. There he acknowledged under oath that he "underst[ood] that [he] would have the right to issue subpoenas or compulsory process for witnesses to testify in [his] defense." (Rule 11 Tr. 7:19-21).

His claim that he pled guilty reluctantly has no record support. There were no hitches or hesitations in the proceeding. Lee agreed he was "in fact guilty." (Rule 11 Tr. 6:23-7:1). He was responsive to Judge Clark's questions during the plea. Asked about the offense conduct, he spoke up to clarify that his conduct was limited to "only Virginia," but he did not otherwise seek to

limit his culpability. Asked whether he "conspire[d] and agreed with Youn-Kyu Park, also known as Oscar, and others, to use, without lawful authority, fraudulent issued driver's licenses," (Rule 11 Tr. 24:12-17), Lee answered in the affirmative. He acknowledged that he "knowingly and intentionally join[ed] a conspiracy . . . with knowledge of the purpose, and with the intent to further that purpose." Given the opportunity to describe his involvement in his own words, he wrote on the Rule 11 form that he "conspired with others to produce fraudulent drivers licenses for illegal immigrants without lawful authority."

Mr. Lee stresses that he gave only short answers, and that he had a Korean interpreter during the plea colloquy. He does not assert, however, that he misunderstood any part of the proceedings. Moreover, Mr. Lee, who has lived in the U.S. for 15 years, stated that he was able to read and write in English. (Rule 11 Tr. 5:3-5). Judge Clark instructed Lee not to "answer a question of mine if you are at all uncertain about what it means or what it's asking of you. . . If you have any uncertainty at all, just say so and I'll put my question another way. Do you understand that? (Rule 11 Tr. 5:19-6:2). Several times during the plea colloquy, he sought and received clarification. (Rule 11 Tr. 20:6-14; 25:3-10). This is not a case where the defendant gave any "indicat[ion] he [did] not fully understand that the facts he is prepared to admit constitute the offense charged." *United States v. Young*, 424 F.2d 1276, 1279 (3d Cir. 1970).

In short, even taking Mr. Lee's change of heart at face value, I see no adequate explanation for his prior statements under oath that he had committed the offense knowingly and without authority. *See United States v. Jones*, 336 F.3d 245, 253 (3d Cir. 2003) (affirming denial of motion to withdraw guilty plea where defendant "listened to the Government's recitation of the material facts underlying his offenses and conceded the accuracy of those facts [during the plea colloquy] . . . then denied those facts at the May 22 hearing, but did not explain why his position had changed so markedly."); *United States v. Graulich*, 524 F. App'x 802, 806 (3d Cir. 2013) ("Rather than attempting to

explain why contradictory positions were taken in the District Court, Graulich claims innocence by arguing that he never had the intent to defraud. This argument is belied by Graulich's plea colloquy, which shows that he admitted to having the requisite intent."). The lack of a sufficient explanation for his plea of guilty undermines the credibility of Mr. Lee's post-plea assertion of innocence. *See United States v. Mejia*, 222 F. App'x 136, 139-40 (3d Cir. 2007) (affirming denial where, although defendant asserted innocence, his present assertions were "inconsisten[t]" and "lack[ing] credibility" because he failed to sufficiently explain why he "thoroughly admitted his guilt and did not contest the Government's characterization of the facts" during plea). In such a case, courts have repeatedly upheld denials of motions to withdraw pleas of guilty. *See United States v. Self*, 393 F. App'x. 47, 50 (4th Cir. 2010) (affirming denial of motion to withdraw guilty plea based on claim of public authority defense because defendant gave extensive statements of his guilt); *United States v. Martinez*, 785 F.2d 111, 115 (3d Cir. 1986) (affirming denial where Defendant admitted factual guilt during plea and then later claimed he "never knowingly admitted occupying the position of an organizer. . . in a continuing criminal enterprise."); *United States v. Baird*, 542 F. App'x 149, 151 (3d Cir. 2013) (affirming denial where defendant moved to withdraw plea because he allegedly lacked the requisite intent, but "offered nothing to explain the contradictory position he took during the plea colloquy.").

The assertion-of-innocence factor, then, does not weigh in favor of granting Mr. Lee's motion.

#### b. Strength of Defendant's Reason for Withdrawal

The second, and related, factor is the defendant's explanation of "why he changed his mind following his guilty plea." *United States v. King*, 604 F.3d 125, 140 (3d Cir. 2010). It is not enough, post-plea, to proffer a defense to the charges; "[t]here are few if any criminal cases where the defendant cannot devise some theory or story which, if believed by a jury, would result in his

acquittal." *Gov't of Virgin Islands v. Berry*, 631 F.2d 214, 220 (3d Cir. 1980) (quoting *United States v. Barker*, 514 F.2d 208, 221 (D.C. Cir. 1975)). Nor will a court allow withdrawal merely based on a "shift in defense tactics, a change of mind, or the fear of punishment." *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001) (quoting *Jones*, 979 F.2d at 318). A defendant's reason for withdrawing his plea must rise above the "belie[f] he made a bad choice in pleading guilty," *United States v. Walden*, 625 F.3d 961, 965 (6th Cir. 2010); a "change of heart," *United States v. Rios-Ortiz*, 830 F.2d 1067, 1069 (9th Cir. 1987); or "[p]ost-plea regrets," *United States v. Stuttley*, 103 F.3d 684, 686 (8th Cir. 1996).

### 1.    Facts and evidence available after the plea

Mr. Lee asserts that he did not discover certain information until after he pled guilty. It is undisputed, however, that Lee was in possession of the essential facts and evidence underlying his defense *before* he pled guilty. By definition, Lee would be aware that Na told him he was a government agent and requested that he gather information on the Park driver's license conspiracy. Lee had access to at least some of his own email correspondence with Na, including the email evidence on which he now relies. (*See* Def.'s Mot. Exs. 4, 5, 8, 10, 11). Lee received emails, including the email in which Na told a Homeland Security investigator that Lee was "pretending" to work for Oscar Park, before he pled guilty. (*See* United States' Opp'n Exs. 6, 7).

When Lee, before his guilty plea, was asserting the closely related "public authority" defense, he had his private investigator interview Na. Na told Lee's investigator that he "advis[ed] Mr. Lee that [Na] worked for Homeland Security Korean Division." Na admitted that, in reality, he was attempting to assist Homeland Security only in the hope that they would help him "obtain[] Green Cards for Mr. NA's brother in law and his family." (United States' Opp'n Exs. 15, 16). Included in the investigator's report was Na's statement that he told "Mr. Lee [to] try and gather information on an individual identified as [Oscar] Park."

Na admittedly wanted to help Lee, whom he called a close friend. In addition to meeting with the investigator, Na provided emails helpful to Lee's defense. (*See* Def.'s Mot. Exs. 4, 5, 8, 10, 11 (showing Na forwarded Defendant their correspondence in June 2013, after Defendant's arrest)). He also provided Lee with old information regarding a criminal conspiracy so that Lee, through cooperation with the prosecution, could try to reduce his sentencing exposure.

Before he pled guilty, then, Lee was in possession of the facts, and most of the evidence, underlying the intent defense he now proffers. He had in hand the emails (many furnished by the government), as well as Na's admissions in the investigator interview. Defendant's pre-plea awareness of those facts undercuts any claim of a just reason for withdrawal. Rule 11 "allow[s] plea withdrawal for any reason that did not exist when the defendant entered his plea . . . [not for] circumstances known to a defendant at the time of the guilty plea . . . ." *United States v. Mayweather*, 634 F.3d 498, 506 (9th Cir. 2010) (internal quotation marks omitted) (affirming denial of motion based on defendant's desire to file suppression motion where "defendant was aware of the prospect of making a suppression motion" and the facts underlying the motion before he pled guilty); *United States v. Underwood*, 174 F.3d 850, 854 (7th Cir. 1999) ("Underwood decided when he saw the PSR that he overestimated the strength of the evidence developed during the continuing investigation, but his reevaluation of his trial prospects afforded no basis for withdrawing his validly-entered guilty pleas.").

### 2.   Na's allegedly enhanced availability

Lee claims that he "did not learn until after [his] guilty plea was entered that Master Na was arrested by the United States Government in Virginia, was found with Homeland Security business cards in his possession and eventually began formally cooperating with the United States Government." (Def.'s Br. 11). Until that point, says Lee, "it was not clear that Mr. Na could be a witness at the trial. Mr. Na was not in federal custody at that time, resided in Virginia and was illegally in the United States." (Def.'s Reply Br. 2-3). I cannot give any great

24

weight to Lee's contention that Na was unavailable as a witness before Lee's guilty plea, only to become available thereafter.

When Lee was asserting the closely related "public authority" defense, he had his private investigator interview Na. Na, far from resisting, actually traveled from Virginia to meet with Lee's investigator. Na made statements to the investigator supporting Lee's defense.

In retrospect, Lee says it was not "clear" that Na would appear. There is no evidence, however, that Lee ever attempted to subpoena Na or otherwise obtain his presence as a witness. At any rate, a tactical miscalculation regarding the availability of a witness is insufficient to support withdrawal. *Gov't of the Virgin Islands v. Berry*, 631 F.2d 214, 221 (3d Cir. 1980) ("Berry and his counsel may have made a tactical miscalculation by not considering the possibility that Francois would not testify at his own trial, but such a tactical error does not require the court to allow withdrawal of the plea.").

Availability aside, the decision to forgo a defense that depended on the testimony of Na was a plausible, tactical one. Lee was aware of the strength of the Government's case against him before he entered his plea. The prosecution's evidence included wiretapped conversations between Lee and Park, video of Lee meeting with a sub-broker in Virginia, and Forms I-797 used by Lee in the scheme.

Lee was also aware of the weaknesses in his own case, and the risk he faced in presenting that case to a jury. Those weaknesses would not necessarily be remedied by Na's appearance as a witness. As outlined above, Na repeatedly lied and dissembled in submissions to the government. Any cross-examiner could shred his credibility, as the government did at the hearing on this motion.

And parts of Na's testimony turned out to be devastating to Lee. At the hearing, Na revealed that, in early 2012, after the Defendant had been working for Park for several months, Na told Lee he wanted to organize his own fraudulent driver's license scheme. Na testified that he asked Lee to collect Park's Forms I-797 so that he could use those forms in the "same way" as

Oscar Park "to commit driver's license fraud." Na testified at the hearing that, after this conversation, Lee and his employees collected Forms I-797 from members of the Park conspiracy. Then Lee stopped working for Park's fraud operation and began working for that of Na. A jury could easily conclude from Na's testimony that Lee obtained information from Park, not to aid in an "investigation," but to assist Na and Lee in setting up their own fraudulent driver's license business.

Lee testified that he sent every piece of evidence he acquired working for Park to "agent Na." The documentary corroboration, however, consisted only of a handful of emails regarding the fraudulent license scheme. (*See* Def.'s Mot. Exs. 4, 5, 8, 10, 11). There was no proof that Lee forwarded obviously useful "evidence": for example, dozens of emails from Park to Lee regarding customers (United States' Opp'n Ex. 55); Park's detailed instructions regarding deposits (United States' Opp'n Ex. 55, at 10); deposit slips; and Park's real-time summary of the status of each active fraudulent license application (United States' Opp'n Ex. 55, at 2, 131). Through counsel, Lee refused to sign a consent order that would have permitted the Government to search for additional emails stored on an internet server. (*See* United States' Opp'n Ex. 64).

Na's emails and statements throughout the investigation are consistent with a desire to shield his friend Lee. The two worked closely together: negotiating several real estate deals in early 2012 (United States' Opp'n Ex. 53); helping an individual living with Na purchase a restaurant in April 2012 (United States' Opp'n Ex. 55, at 193, 303, 321); negotiating a lease related to a medical center in June 2012 (United States' Opp'n Ex. 55, at 285-88); and helping the son of Lee's cousin transfer to a United States college through Na's educational consulting business in November 2011 (United States' Opp'n Ex. 53, at 9-9.1). The closeness of that relationship tends to belie Lee's claim that he believed Na was a Homeland Security agent.

Finally, the timing of Defendant's alleged discovery of Na's availability as a witness—his proffered reason for withdrawal—does not coincide with the date

of filing of this motion. Defendant did not attempt to withdraw his plea after Na was arrested in January 2014; when Na agreed to cooperate with the Government in March 2014; or when Defendant's counsel purportedly gained access to Na's criminal docket in June 2014. Rather, Lee waited until January 2015, before seeking to withdraw his guilty plea. That delay gives rise to an inference that Lee "suffered from 'pleader's remorse' once he learned of the proposed Guideline range in his Presentence Investigation Report." *United States v. King*, 604 F.3d 125, 140 (3d Cir. 2010) (finding that Defendant's claim that he discovered venue error was not the reason for seeking withdrawal because he "could have objected to venue much sooner" than when he filed his motion to withdraw his plea); *United States v. Doyle*, 981 F.2d 591, 595 (1st Cir. 1992) ("Because the timing of a defendant's attempted plea withdrawal is highly probative of motive, close scrutiny of the chronology is important in adjudicating whether retraction is fair and just. . . . . [Here] [t]he chronology of events inexorably implies that this 'reason' was no more than a contrived excuse to escape the district court's forecasted sentence.").

Just as Lee pled guilty on the brink of trial, he sought to withdraw that plea on the brink of sentence. That pattern is consistent with a plan to avoid and delay imposition of punishment.

When Mr. Lee pled guilty, he was aware of the government's evidence. He was acutely aware of the risks of presenting his defense to the jury, especially via the flawed vehicle of Na's testimony. Lee made an informed tactical decision to plead guilty rather than face a trial.

"A guilty plea 'frequently involves the making of difficult judgments.'" *Berry*, 631 F.2d at 221 (quoting *McMann v. Richardson*, 397 U.S. 759, 769 (1970)). But having made a tradeoff in one direction, a defendant is not privileged to assess the outcome and then try it the other way. A defendant's reevaluation of his prospects of success does not furnish a fair and just reason to permit withdrawal. *See id*; *United States v. Wilson*, 81 F.3d 1300, 1309 (4th Cir. 1996) ("It is clear from the plea hearing, as well as the subsequent hearing

on the motion to withdraw, that appellant understood the risk of presenting [his defense of innocent intent] to a jury. Rather than facing this risk, appellant chose to plead guilty to a single offense."); *United States v. Lombardozzi*, 436 F.2d 878, 881 (2d Cir. 1971) ("The evidence clearly supports the lower court's conclusion that appellant's own calculation of the possibilities and risks involved as well as the actual value of any commitments made to him by the prosecutor motivated his plea of guilty."). Neither a "shift in defense tactics," *Brown*, 250 F.3d at 815, nor "reevaluation of the government's case against him," *United States v. Schmidt*, 373 F.3d 100, 103 (2d Cir. 2004), is sufficient to support withdrawal.

In sum, I find that Lee has not established a strong reason for changing his plea.

### (c) Prejudice to the Government

The third factor is potential prejudice to the Government if the plea were to be withdrawn. I discuss the prejudice factor briefly.

The Government asserts several forms of prejudice, including: (i) that Defendant was able to preview the Government witnesses' testimony; (ii) that Defendant's withdrawal would result in wasted resources in reliance upon his plea; (iii) that a testifying co-conspirator, who was already sentenced, no longer has an incentive to cooperate with the government.

By waiting until after the proceedings against his alleged co-conspirators were completed, Lee was able to preview the testimony of adverse witnesses. Those witnesses included a person who provided stolen blank immigration forms to brokers; special agents; and a cooperating defendant who testified against his former co-conspirators. That strategy of delay, says the government, unfairly allowed Lee to build his defense around the government's trial strategy. *See Berry*, 631 F.2d at 221 (noting district court's finding that defendant's preview of government's case constitutes prejudice).

The government adds that if the motion is granted, it will be put to the unfair burden of reassembling its case. At one time, the government had

prepared the witnesses and organized the evidence, and it conducted a trial of a co-defendant. Now, in reliance upon Lee's plea of guilty, it has moved on. If the plea is withdrawn, the government will have to conduct a second, duplicative trial. *United States v. Robinson*, 587 F.3d 1122, 1132 (D.C. Cir. 2009) ("[P]rejudice also occurs where a defendant's guilty plea removed him from an ongoing trial of co-defendants, who were then found guilty.").

Finally, the government points out that a cooperating witness, Sean Park, has been sentenced and has already received the benefit of a motion under U.S.S.G. § 5K1.1. It is possible that the government does not retain much leverage to induce that cooperating witness to testify again. *See Berry*, 631 F.2d at 221 (noting district court's finding of prejudice where co-conspirator had been sentenced and his continued cooperation as a witness against the moving defendant was, therefore, uncertain); *United States v. Cox*, 553 F. App'x 123, 127 (3d Cir. 2014) (affirming finding that "Government would suffer prejudice from a withdrawal of the plea because its cooperating witness had already been sentenced"); *United States v. Myrick*, 38 F. App'x 104, 106 (3d Cir. 2002) ("[T]he District Court correctly concluded the government would be prejudiced by [the defendant's] withdrawal of his plea [because] . . . one of the government witnesses received a reduction in sentence.").

To that point, Lee replies that any trial of him would have a single focus: his government agent intent defense. This particular cooperating witness, he says, would have nothing to offer regarding that issue.

I find that the government has made some showing of prejudice, though not an overwhelming one. All in all, it would not be sufficient to sway my decision if I believed the other requirements for withdrawal of a plea had been met. I do not believe, however, that those requirements have been met.

## IV. CONCLUSION

In light of the evidence produced at the hearing and my assessment of the witnesses' credibility, I have analyzed the relevant factors: the defendant's assertion of innocence, the strength of the defendant's reasons for withdrawing the plea, and prejudice to the Government. I find that the defendant's assertion of innocence is not strong or credible; that his government agent intent defense was fully available to him at the time he decided to plead guilty; and that Na's supposedly enhanced availability as a witness is not sufficient reason to permit withdrawal of a solemn admission of guilt under oath.

For the reasons stated above, Defendant's motion to withdraw his plea of guilty (Dkt. No. 150) is **DENIED**.


**Hon. Kevin McNulty**
**United States District Judge**